IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

WILLIAM LEE DRUMBARGER,
Prison Id. # 98676,
      Plaintiff,

v.

JIM CROSBY, M.D., in his individual
and official capacity as Commissioner
for T.D.O.C. Rehabilitation Program,
ROBERT IRVIN, in his individual and
official capacity as Executive Direc-
tor of the Tennessee Board of Par-
oles, WILLIAM PARSONS, in his indi-
vidual and official capacity as Par-
ole Hearing Director for the Tenn.
Board of Paroles, and, RONNIE COLE,
in his individual and official cap-
acity as Parole Board member,
      Defendants.

Civil Action No. _____

JURY TRIAL REQUESTED

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
## FILED PURSUANT TO 42 U.S.C. § 1983

### Introduction

This is a civil rights action filed by William Drumbarger, a pro se state prisoner, for damages and injunctive relief under 42 U.S.C. §1983, stemming from an improper and illegal parole review hearing in April 2010, and subsequent appeal denial rendered against plaintiff on July 19, 2010. Drumbarger alleges Due Process violations contrary to the Fourteenth Amendment to the United States Constitution, Equal Protection violations contrary to the Fourteenth Amendment to the United States Constitution, Deliberate Indifference to a serious medical need in violation of the Eighth

Amendment of the United States Constitution, violations of both the Americans with Disabilities Act 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Ex Post Facto clause violations of the Untied States Constitution, Article I § 9, Clause 3, § 10 Clause 1. Plaintiff also seeks injunction and damages pursuant to the Americans with Disabilities Act and § 504 of the Rehabilitation Act.

1. PREVIOUS LAWSUITS: Plaintiff has NEVER before filed a Federal lawsuit in any district of the United States judiciary.

2. PLAINTIFF'S CURRENT PLACE OF CONFINEMENT: West TN State Prison; PO Box 1150; 480 Green Chapel Rd.; Henning, TN 38041-1150.

   The facts relating to this lawsuit occurred at plaintiff's present place of confinement.

## I. JURISDICTION

1. A) Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

   B) Jurisdiction of the Court is invoked pursuant to 28 U.S.C § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by Acts of Congress providing for equal rights of persons within jurisdiction of the United States.

## II. EXHAUSTION OF REMEDIES

2. This is a civil action arising from several violations of Plaintiff Drumbarger's Constitutional rights with regards to how the Tennessee Board of Paroles reached their decision in Drumbarger's April, 2010 parole hearing. Administrative appeal was taken in order to exhaust all avail-

able remedies. Denial of said administrative appeal was rendered July 19, 2010.

## III. VENUE

3. The Middle District of Tennessee is an appropriate venue under 28 U.S.C. § 1391(b)(2) because defendants reside in this district and because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## IV. PARTIES

4. The plaintiff, William Drumbarger, was and is incarcerated at West Tennessee State Prison in Henning during the events described in this Complaint.

5. Defendant Jim Crosby, M.D., is the Assistant Commissioner for the Tennessee Department of Corrections' Rehabilitation Program. His address is located at: Rachel Jackson Building, 320 Sixth Avenue North 5th Floor, Nashville, TN 37242-0465. Dr. Crosby is responsible for administrative and executive functions relating to insuring all the rehabilitative tools used by the Tennessee Board of Paroles (T-BOP) are being implemented consistently and without discrimination. He is being sued in his individual and official capacities.

FN 1

6. Defendant Robert Irvin is Executive Director of the T-BOP. His address is: Parkway Towers Suite 1300, 404 James Robertson Parkway, Nashville, TN 37243-0850. Mr. Irvin is responsible for administrative and executive functions of the Board of Paroles, and sets Board policy -- both written and unwritten. Irvin is the supervisor to the following defendants, and is directly accountable for insuring that the Board operates within the guidelines of statutory law. Wherefore, plaintiff will show that Defendant

FN 1: Tenn. Board of Parole

3

Irvin and T-BOP employees under his direct supervision violated Drumbar-
ger's Constitutional rights with regard to his April, 2010 parole hearing.
Irvin is being sued in his individual and official capacities.

7. William Parsons was and is Parole Hearing Director for the T-BOP. His
address is Parkway Towers Suite 1300, 404 James Robertson Parkway,
Nashville, TN 37243-0850. Mr. Parsons reviewed Drumbarger's parole hearing
appeal to insure his hearing conformed to law and administrative policy,
both written and unwritten. He personally violated Drumbarger's Consti-
tutional rights in the course of denying his appeal. Parsons is being sued
in his individual and official capacities.

8. Ronnie Cole is a voting member of the T-BOP. His address is: 1355 Flow-
ering Dogwood Lane Suite C, Dyersburg, TN 38024. Mr. Cole chaired
Drumbarger's parole hearing and, as such, he was personally involved in
violating Drumbarger's Constitutional rights. Cole is being sued in his
individual and official capacities.

9. At all times relevant to the events described herein, all the defen-
dants have acted, and continue to act, under color of state law.

### V. FACTUAL ALLEGATIONS

#### History/Facts Relating to Claim

10. William Drumbarger began serving his "Class-X" Life sentence WITH par-
ole in January, 1982, for acts of fellatio on minor boys. He was twenty (20)
years of age, and there was no overt force used, nor penetration of a victim.

11. At that time, Tennessee parole statute T.C.A. § 40-28-117(a) stated
that prospective parolees, provided it not be "incompatible with the
welfare of society... shall be allowed to go upon parole" when eligible.
[emphasis added].

12. Also at that time, the Board's own rules, through Rule 1100-1-1-.06,

4

stated that each prospective parolee was/is entitled to the "presumption" of parole and "will be released... when he is first eligible."

13. Parole Board members were required to conduct a full study of the case for each resident (T.C.A. § 40-3602), and conduct a personal study of the inmate being considered for parole (T.C.A. § 40-3615). This personal study was required to take into account the prisoner's individual characteristics, circumstances, needs and potentialities (T.C.A. § 40-3601). Other factors the Board had to consider at the time of plaintiff's offense included the inmate's health, maturity level, stability, ability to take responsibility, his conduct in the institution, attitude toward law and authority, and the degree of family support (Tenn. Rules and Regs. 0420- 1- 1-09[g]). The Board was required to concern itself with the individualized consideration of each offender.

"While no prisoner shall be released on parole merely as reward for good conduct, good conduct must certainly be considered as a factor for parole (Tenn. Rules and Regs. 0420-1-1-.09[1][b])." These pre-July 1982 regulations also required an explanation as to what must be done to achieve a parole recommendation if parole was denied (Tenn. Rules and Regs. 0420-1-1-.08[4][b]).

14. Sex offenders, of which Drumbarger was/is a member of that class, had an additional gatekeeper before release eligibility: the psychological evaluation, as defined in both T.C.A. §§ 40-28-116(a) and § 40-35-503(c).

These statutes provided that inmates convicted of sexual offenses prior to July 1, 1982, not be released upon parole until "[a] psychiatrist or licensed clinical psychologist... funded by the state... certified" in writing an "evaluation and opinion..: that the person does not pose the likelihood of committing sexual assaults upon release from confinement."

5

[Analysis in Tenn.Op.Atty.Gen. numbers 90-04 and 90-10].

15.  T.C.A. § 40-35-117(c) was passed into law in 1989 and provided that "For all persons who committed crimes prior to July 1, 1982, prior law shall apply and remain if full force and effect in every respect, including, but not limited to, sentencing, parole, and probation." [Acts 1989, ch. 591 § 6]. (Emphasis added).

16.  In 1985 the Tennessee Legislature passed T.C.A. § 41-21-236(3), which provided that "Class-X" offenders (of which Drumbarger is a member of that class), could receive "sentence reduction credits," waiving the right to serve their sentence under the law in effect at the time their crime was committed.  The legislature had passed this law to relieve overcrowding, and it was intended that "Class-X" felons serve less time than they would under their old sentences.  Given the intent of this legislation, there is no reason to believe the legislature, who knew the state of the laws, intended to take away the presumption of parole for those it applied to -- especially in light of paragraph 15, herein.

17.  Drumbarger signed the waiver, which brought his first parole date from January 2012 to January 2004.

18.  Prior to his first parole hearing, Drumbarger made several attempts to get into the T.D.O.C. Sex-Offender Treatment Program (S.O.T.P.), the first being in 1997, wherein he was told by the program director that he believed the T-BOP had a policy of not paroling sex-offenders due to "seriousness of the offense" (see Exhibit A in Addendum).  Despite constant inquiries to get into the S.O.T.P., plaintiff has never been allowed in.  In fact, the application specifies that a prisoner be within nine (9) years of his "flat date" (see Exhibit B in Addendum).  With "Life," Drumbarger has no "flat date."

19.  From approximately 2002-2003, Drumbarger participated in therapy ses-

sions with Dr. Anne McSpadden, Ph.D., a state-employed expert on sex-offenders who has known Drumbarger since 1993, to access the state of his mental health prior to going up for parole in 2004.

20.    Just prior to his 2004 parole hearing, Dr. McSpadden told Drumbarger that she was the expert doing T-BOP psychological evaluations of sex-offenders as required by T.C.A. § 40-35-503(c) to determine parole eligibility. She also told Drumbarger that if the T-BOP referred him to her for this evaluation, that she would, in her words, "certify" him for release.

21.    In January, 2004, one month past his Release Eligibility Date, Drumbarger met Board Chairman Charles Traughber at W.T.S.P.

22.    Drumbarger had a reasonable expectation that, with his 1981 parole scheme stating he would be paroled when first eligible, and with a favorable psych-eval that he be not likely to reoffend, then he could expect a short-term denial for the psych-referral, but then receive a parole grant.

23.    Adding to his optimism were numerous acquired certificates of program completion within T.D.O.C., to include Anger Management Phases I and II, Vocational Plumbing, college credits towards an Associates Degree, positive involvement in prison sponsored clubs and activities, and fourteen (14) letters of support from various staff members.

24.    Drumbarger also had Associate Warden Ross Bates present in support of his release, and, a "Letter of Support" from his trial district attorney, the Honorable Mary Hausman (see Exhibit C in Addendum), wherein she stated that Drumbarger had already served "[m]ore than double..." the amount of time the State felt sufficient in 1982.

25.    Chairman Traughber denied Drumbarger without explanation or referral for a psychological evaluation, nor referral to the S.O.T.P.    Drumbarger

7

was continued five (5) more years for "Seriousness of the Offense."

26. Drumbarger, being slight in stature, has had a multitude of physical attacks made against him by other inmates over the years for little or no reason other than his sexual orientation and the charges for which he is incarcerated, documented as sixteen (16) "fighting" disciplinaries in his file.

27. These attacks have resulted in painful and chronic shoulder dislocation, ruptured ear drum, and numerous cuts and contusions over the years.

28. In July of 2008, approximately six (6) months prior to his next parole hearing, Drumbarger was attacked by an inmate upset at being sent to punitive segregation, and who announced that if he was "[g]oing to the hole, it was going to be for a good reason." He attacked Drumbarger in full view of the guards, and was promptly taken to segregation.

28. Left alone on the pod with no security, Drumbarger was then attacked by the inmate's friend. Drumbarger did not fight back in either circumstance (knowing a "write-up" could hurt his parole chances), as was documented on surveillance cameras.

29. Drumbarger was a good inmate, but because a "fight" is defined in policy as a "physical altercation between two inmates," he was written-up and sent to segregation as well. The reporting officer alleged that Drumbarger had attempted to push the other inmate off of him. No mention was made to the second assault on surveillance cameras.

30. Drumbarger spent more time in segregation than either of his two attackers because he had challenged the wrongful disciplinary, knowing it could hurt his parole chances. The Disciplinary Board refused to admit surveillance evidence, and Drumbarger was found guilty of "fighting."

31. In January 2009, Drumbarger again met the T-BOP, with Board Member Ronnie Cole presiding as the sole board member. Along with everything he

8

presented in 2004, Drumbarger also had: friends and family supporters present, Dr. Anne McSpadden, Ph.D., also in support, and two attorneys from Nashville appearing pro bono because they believed so strongly in him.

32. Citing Drumbarger's "fighting" disciplinary six months earlier and "[t]he seriousness of the crimes you have committed," Board Member (B/M) Ronnie Cole continued Drumbarger one year.

33. However, prior to continuing him, B/M Cole asked Drumbarger if he was "[a]ware of the statutory language... referencing sex-offenders in regard to parole issues?" Drumbarger responded, "[t]here has to be certification from a state-employed psychologist that I am not likely to reoffend." B/M Cole then stated that, "I am going to request a psychological evaluation be conducted to see if you do meet the applicable statutory language."

34. In September of 2009 Drumbarger was called to the W.T.S.P. Infirmary. There he met with Dr. Stephen Rutledge, Ph.D. the Board contracted psychological examiner retained for the T.C.A. § 40-35-503(c) psychological evaluation to determine Drumbarger's release eligibility. Dr. Rutledge worked for a company known only to plaintiff as "MHM," and whose services were contracted by the T-BOP.

35. Drumbarger felt that the interview went well and, at the conclusion of it, he asked Dr. Rutledge if he would be certifying Drumbarger as being not likely to reoffend, or words to that effect. Dr. Rutledge then told Drumbarger that he was not allowed to use that language in his evaluation. He stated that at one time they did give that language, but "MHM" no longer allowed it for reasons he wasn't sure of, no matter how low the inmate scored for risk. Dr. Stephen Rutledge has put these facts into a statement that Drumbarger is prepared to introduce as evidence for this lawsuit (see Exhibit D in Addendum).

9

36. Within a few days Drumbarger went to see Institutional Parole Officer (I.P.O) John Elder. He told Mr. Elder that his psychological evaluation went well, but that Dr. Rutledge had told him that he wasn't allowed to give him the verbatim words that he was "certified" as "not likely to re-offend." Elder told Drumbarger that without that language his evaluation would be insufficient to support his release on parole. Drumbarger lamented to I.P.O. Elder that this was not fair: He was sent to the doctor contracted by the T-BOP to determine parole eligibility, but that the doctor could not certify anyone, no matter how low their risk scores.

37. I.P.O. Elder then told Drumbarger that the T-BOP paroled no sex offenders off of their sex offenses. That instead they would make them "flatten" their sex offense, and then parole them off a secondary offense, such as "kidnapping" or "armed robbery."

38. Drumbarger again lamented that this was not fair because he had no "flat date," nor a secondary charge to parole onto, and this in essence turned his Life sentence <u>with</u> parole to one of Life with<u>out</u> parole. Elder expressed his sympathies, but said that was true "[u]ntil the laws change."

39. Approximately three (3) weeks later Drumbarger had a follow-up meeting with Dr. Rutledge to review his "Static-99" scores (the Static-99 being the state-of-the-art test for sex-offender recidivism prediction). Dr. Rut-ledge told Drumbarger that he had been tested on two different scales. One of them had a risk prediction range from 1-20. On that one Drumbarger had scored a "5.5", which he would round-off in his report to "6." The second one, the Static-99, scored 1-10, and Drumbarger had scored a "3", or moderate low. A person with those scores would have a recidivism rate of 14% after ten (10) years (see Exhibit D). Drumbarger saw these numbers as a

clear showing of an individual not likely to reoffend, as a report publish-
ed in the Memphis Commercial Appeal sometime after 2008 quoted the T.D.O.C.
as having a recidivism rate of over 40% after just three years. (see Exhib-
it E in Addendum). Fourteen percent after 10 years is far below the state
average.

**40.** Drumbarger reported the optimistic results of his test scores to
I.P.O. Elder, but he reaffirmed that the T-BOP was looking for verbatim
language that he be "certified" as "not likely to reoffend," and that with-
out that language Drumbarger would not receive a parole grant.

**41.** Drumbarger relayed the entirety of that information to his family and
supporters. On October 2, 2009, friend Jackie Payne wrote to Board Chairman
Charles Traughber complaining of the inherent unfairness of contracting a
company to do the gatekeeper, psychological evaluations who had ordered
their doctors not to certify anyone, no matter how low their scores.
Shortly after sending this letter, Dr. Rutledge was fired from "MHM"
(letters relating to his termination are in plaintiff's possession).

**42.** In early December of 2009 I.P.O. Elder told Drumbarger that his Jan-
uary 2010 parole hearing would be continued until April 2010 so that the
T-BOP's staff attorneys could review Drumbarger's file.

**43.** Despite Elder's dire predictions, Drumbarger felt optimistic that,
since he would be represented by counsel at his next parole hearing, and
since the Board knew they had been caught at not following statutory guide-
lines with regard to psychological evaluations, that they would either give
him a parole grant, or correct the dysfunctional process. Drumbarger felt
that, from a legal standpoint, being certified in writing as not likely to
reoffend and having low risk-prediction scores were virtually interchange-
able concepts from a legal standpoint.

11

44. In April 2010, Plaintiff Drumbarger again met the T-BOP and B/M Ronnie Cole (this time via closed-circuit TV).

45. The record will show that in 2009 B/M Cole stated that the purpose of the psychological evaluation was "[t]o see if you meet the applicable statutory language" with regard to "sex-offenders." However, in 2010 he made only slight reference to the psychological evaluation, stating, "The appropriate evaluation is in your file. I have read through the information that is contained in that file, and my vote today, sir, is to decline you for a period of three years...."

46. The 2010 hearing followed a similar path as the 2009 hearing, with Drumbarger's supporters again speaking on his behalf, to also include in 2010 Case Manager Sherri Hancock, who has known Drumbarger within the T.D.O.C. well over ten (10) years.

47. Attorney Lonnie Hoover again appeared pro bono, and reminded B/M Cole of all Drumbarger's accomplishments in 28 years of incarceration, in 2010 then more than <u>triple</u> the amount of time trial D.A. Hausman had said in 2004, in a statement to the T-BOP, was sufficient for the State.

48. Prior to closing the hearing, Drumbarger noted for the record that he felt a recidivism rate of [14%] after ten (10) years did meet the statutory definition of not being likely to reoffend, if the state average was over 42% after three (3) years. He also noted his concern of his sentence becoming one of Life without parole instead of Life with parole.

49. Attorney Hoover added that Drumbarger was "still the same man" B/M Cole had thought enough of in 2009 to defer him only one year after a fighting disciplinary, and that a three year deferral was "devastating." Mr. Hoover also asked B/M Cole to reduce the deferral, while giving Drumbarger a goal to work toward: "As motivated as he is, I'm sure he'd do anything

12

the Board asked of him." [2010 hearing transcript].

50.    Despite no new disciplinary infractions, a psychological evaluation with low risk numbers, and Drumbarger having also completed in the last year the T.D.O.C. Pre-Release Class, B/M Cole stated he was not going to change his vote... the deferral would stay at three (3) more years.

51.   The following day, April 23, 2010, I.P.O. Elder explained to Drumbarger that without the verbatim words "certified" as "not likely to reoffend" in Dr. Rutledge's report, the Board's "hands were tied."

52.   Drumbarger resubmitted Elder's statement to him on a T.D.O.C. Inmate Request Form with said statement in quotation marks, wanting to create a record in writing of the Board's reasons for turning him down.  Offering this statement with a follow-up question would give Elder a chance to correct or refute it if inaccurate.  On May 10, 2010 I.P.O. Elder returned Drumbarger's form to him without refuting the quoted statement he had made. (see Exhibit F in Addendum).

53.  Drumbarger believes this statement, in combination with B/M Cole Deferring him three (3) years immediately after noting he had read the info in the psych-eval, demonstrate the T-BOP's only reason for denial was the report that restricted Dr. Rutledge's language (see Exhibit D in Addendum).

54.  An identical form and inquiry with the quote was also sent to B/M Cole on the same date.   T-BOP staff attorney Columba Hale answered on May 17, 2010, stating only that the Board is "[r]equired by statute to determine parole eligibility [sex-offenders] for release based on the evaluation from a provider whose services are contracted by the state."  This response confirms the correct statutory interpretation that the psychological evaluation is the gatekeeper for sex-offenders to make parole.   In 2009 Drumbarger had met all the necessary criteria leading up to the evaluation, but

after having an evaluation with low scores, Drumbarger was then deferred three years for missing verbatim language specifically discussed in Tenn.-Op.Atty.Gen. No. 90-04 as not being required.

55.    In June of 2010 Drumbarger was able to track down Dr. Stephen Rutledge.    Drumbarger was then able to get the statement from him corroborating that he was under orders not to use the verbatim language in his report that the T-BOP required before giving a parole grant (according to I.P.O. John Elder, an employee of many years with the T-BOP).

Administrative Appeal

56.    Just prior to receiving that evidence, Drumbarger's deadline for filing Administrative Appeal had arrived, and on June 10, 2010 Drumbarger submitted his appeal, claiming:

57.    1) That he had significant new information for the Board to consider, which was in fact written certification from Dr. Anne McSpadden, Ph.D. a state-funded psychologist and expert on sex-offenders, that Drumbarger was "[a] low risk for reoffending," and that she recommended that he be allowed "to participate in a community based program [for sex-offender treatment] either in conjunction with his placement in a minimum security setting, or as a contingency of release on parole." (see Exhibit H in Addendum).

Deliberate Indifference to a Serious Medical Need

58.    Dr. McSpadden told the T-BOP of her qualifications with regard to sex-offenders, and stated that sex-offender treatment was "[i]mportant and ne-cessary to reduce the risk... [of] future offending behavior."   Dr. McSpad-den also urged the Board to "make some provision to allow this man [Drum-barger] to complete sex offender treatment" since the Department of Cor-rections based S.O.T.P. would not accept him. Drumbarger noted within his

14

appeal that to withhold treatment was deliberate indifference of his treatable illness.

59.   2) Drumbarger also alleged that B/M Cole was homophobic of him and discriminating against his sexual orientation.   (Drumbarger will not raise this claim on Federal appeal).

### Ex Post Facto, Due Process, and Equal Protection

60.   3) Drumbarger finally contended that the T-BOP was incorrectly applying current policies and rules to him, which was not the parole scheme in effect at the time he committed his crimes.   This current parole scheme, Drumbarger claimed, seriously disadvantaged him.

61.   I.P.O. Elder stated that the T-BOP no longer grants parole to sex-offenders, but at the time of Drumbarger's offenses they did.   Drumbarger can furnish, even prior to discovery, two examples of similarly situated individuals who were given timely parole grants (see Exhibits J and K ).

62.   On July 19, 2010, Drumbarger received notice from Parole Board Hearing Director William Parsons that his appeal was summarily denied.

### VI. CLAIMS FOR RELIEF

63.   Plaintiff William Drumbarger supports his claims with reference to the previous paragraphs of this complaint (P):

64.   Defendant Jim Crosby, M.D., is the Assistant Commissioner for the T.D.O.C. Rehabilitation Program.   Crosby is responsible for Administrative and Executive functions, to include the rehabilitative tools available to the T-BOP, e.g., Drug and Alcohol Rehabilitation, Anger Management Phases I and II, Life Without a Crutch, Sex-Offender Treatment Program, Pre-Release Class, and other programs used within the T.D.O.C. and by the T-BOP as tools to assist prisoners in being both better suited to live and remain

15

free, and to address their therapeutic needs.

65. Defendant Crosby, under color of state law, violated Drumbarger's Constitutional rights by failing to insure that the S.O.T.P. would be available to Drumbarger, a Lifer with parole who had a) a liberty interest in coming to parole hearings having completed the S.O.T.P. (Paragraphs [P] 11-15, and Exhibits A & B in Addendum), & b) Lifers with parole eligibility who had a serious medical need and could not receive referral but through the T-BOP (see Exhibit I in Addendum [Drumbarger still tries to get into the S.O.T.P., but in recent years is just repeatedly told he's on the "waiting list", despite the passing years, Exhibit I]).

66. Specific to his Constitutional rights, Plaintiff Drumbarger has a written diagnosis and recommendation for treatment from a psychologist and expert in the field of sex-offenders (Dr. Anne McSppadden, Ph.D.). Crosby demonstrated deliberate indifference to a serious medical need in violation of Drumbarger's 8th Amendment rights, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act, by not having a plan in place to insure that Drumbarger had access to treatment. Within the T.D.O.C. the facilities to support everyone needing treatment do not exist (cost not being a defense). If the program is not comprehensive enough to include Drumbarger, a man eligible for parole since 2004, then Dr. McSpadden has offered another option, that being a recommendation from the T-BOP to a community based program as a condition of parole (see Exhibit H in Addendum).

67. Drumbarger also alleges that Crosby was instrumental in violating his due process rights contrary to the 14th Amendment because, having had the benefit of completing the S.O.T.P., Drumbarger would realistically expect having the required statutory certification that the T-BOP required, thereby giving him a liberty interest in completing sex-offender treatment.

68. Crosby also violated Drumbarger's equal protection rights in contrast

the 14th Amendment, because other similarly situated sex-offenders with identical offenses were allowed treatment by the T.D.O.C. for their serious medical, psychological needs. Drumbarger has been excluded without justtifiable governmental or rehabilitative purpose, causing the mental injuries of anxiety and depression, and adding to his time in prison.

69. Defendants Robert Irvin, William Parsons, and Ronnie Cole are all employed by the Tennessee Board of Probation & Paroles (T-BOP herein). Under color of state law, each of them have worked jointly and separately to violate several of William Drumbarger's Constitutional rights with a single course of action that has had multiple and overlapping consequences for Drumbarger.

70. Drumbarger will now declare these violations and injuries in detail, and then explain each defendant's personal involvement in participating and creating these violations:

71. I.P.O. John Elder told Plaintiff Drumbarger, and he also has it in writing from the S.O.T.P. (P's 18, 36-40, Exhibit A in Addendum), plus plaintiff hopes to further gain evidence through discovery, that the T-BOP does not parole sex-offenders off of their sex offenses. This is an inhouse policy not conforming to law (state or federal), nor written T-BOP policy.

72. Furthermore, it is not the parole scheme applicable to Drumbarger's late 1981 to January 1982 offenses, which is: T.C.A. §§ 40-28-117(a), § 40-28-116(a), § 40-35-503(c), and § 40-35-117(c) (P's 11-15), and the T-BOP's own Rules, 1100-1-1-.06 (P 12). These rules and laws stipulate that Drumbarger has a "presumption" of parole "when first eligible", provided he meet the requirements of the added gatekeeper: the psychological evaluation to determine that he is not likely to reoffend (P 14).

73.  Not following the applicable parole statutes and scheme for when Drum-
barger's offenses occurred is a violation of his due process and equal pro-
tection rights, as well as an Ex Post Facto violation because their actions
have caused him to spend significantly more time in prison than if he had
gotten the promised certification for release from Dr. McSpadden in 2004
(P 20), and even more-so if they do not parole sex-offenders off of their
sex offenses, because that would, as I.P.O. John Elder noted, change Drum-
barger's sentence from Life with parole to Life without parole (P's 36-40).

74.  It was this secret, unwritten policy of not paroling sex-offenders off
of their sex offenses which inspired the T-BOP to mandate the verbatim
words on psychological evaluations "I certify" (said prisoner) is "not
likely to reoffend." Drumbarger can prove that: a) exact wording in the
psychological report is not required by state law (only a qualified ex-
pert's risk assessment), and b) were it required by state law, then the T-
BOP fraudulently engaged in these evaluations by contracting (in MHM) a
company who had ordered Drumbarger's psychological evaluator not to certify
anyone, no matter how low their risk scores (P 35, and Exhibit D in Adden-
dum).  This in itself is a violation of Drumbarger's due process rights
under the 14th Amendment.

75.  Plaintiff Drumbarger also alleges the defendants' actions, as prev-
iously described, violate his equal protection rights of the 14th
Amendment, as similarly situated sex offenders in the past were given par-
ole review hearings and, ultimately, parole grants, using the same parole
scheme as should be applied to Drumbarger's 1981 offenses:

76.  Drumbarger can even now, absent discovery, produce examples of two
prisoners who in years past received parole review hearings following the
same parole scheme as should also apply to Drumbarger.  These inmates are/

were similarly situated as Drumbarger in that, a) they both committed their offenses at a time when the parole scheme was the same as Drumbarger's, and b) both offenders committed same-sex assaults that involved acts of fellatio (Exhibits J and K in Addendum). In fact, Inmate Randall Proctor's offenses also included "Assault with Intent to Murder," and he made parole his first year up (2000) from a Life sentence, off a positive evaluation from Dr. Anne McSpadden, Ph.D., the same psych-examiner who had certified for the T-BOP on Drumbarger's appeal that he was "[a] low risk for reoffending based on the instruments commonly used to measure sex offender risk" (P 57, and Exhibit H in Addendum). I/M Proctor served 25 years in all, presently 4 1/2 years less than Drumbarger at the time of this filing, and Drumbarger can show his own offenses contained no overt force nor acts of violence.

These examples, along with others following discovery, will show that the T-BOP violated plaintiff's rights to Equal Protection: If I fall under the same parole scheme as similarly situated individuals, then why not me? Why has the standard changed now?

77. These defendants may further have violated Drumbarger's due process, equal protection, and 8th Amendment rights proscribing deliberate indifference to a serious medical need, as well as violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, if there were in place rules and provisions making sex-offender treatment (S.O.T.) available through parole board referral, or as a condition of parole, but failed to insure that these programs and opportunities were accessible to Drumbarger.

78. Drumbarger's equal protection rights were further violated in that other, similarly situated sex-offenders are allowed access to S.O.T. (thro-

19

ugh the T.D.O.C./S.O.T.P., or a community based program as a condition of parole), but not Drumbarger. Also, other similarly situated inmates with individual special needs (alcohol/drug rehab, anger management, pre-release etc.), were allowed access to their programs, and Drumbarger was not allowed referral from the T-BOP. Drumbarger's medical need is the genesis of his incarceration and, while drug and alcohol programs are not protected under the law, mental health programs are, and even a layperson at law can see that a convicted sex-offender should receive some type of treatment to be able to live and remain free. After all, society has a stake in Drumbarger not committing new offenses once paroled.

79. Not only did Drumbarger have a liberty expectation in meeting the T-BOP after having graduated from his treatment program (as other similarly situated inmates do following their parole statutes and schemes), but other similarly situated sex-offenders with the same type of offense as Drum-barger participate in programs designed to help them live and remain free.

80. Having not gone through the S.O.T.P. has adversely affected Drumbar-ger's physical and mental health as well: As a sex-offender housed in general population, plaintiff has had to literally fight to survive. In the last six (6) years, Drumbarger has endured two shoulder dislocations in fights, a ruptured eardrum causing long term hearing loss (of which both are documented in his medical records), and numerous cuts and contusions.

81. Mentally, Drumbarger lives daily with constant emotional stress and suffering: depression, despair, and anguish at his continued loss of liberty without hope of parole, as I.P.O. John Elder told Drumbarger that "[u]ntil the laws change," his Life sentence with parole will be Life without parole (P 38); presently there is no legislative movement to change sex-offender laws that should already be working if properly interpreted.

Case 3:11-cv-00684   Document 1   Filed 07/15/11   Page 20 of 55 PageID #: 20

82. Plaintiff experiences further emotional injury from the stress, insecurity, and real fear of being attacked on a daily basis because of how he is perceived by other prisoners, due to: a) having sex-related charges against minors, b) those charges being homosexual in nature makes him a target in the eyes of prison predators, and c) having a slight build. These attributes give the perception that he is weak and an easy target, making him constantly at-risk for harassment, assault, and victimization. Drumbarger has always had to be prepard to fight other inmates, usually bigger than himself, to keep from being raped or otherwise harmed (P 26-29, see Exhibit L in Addendum). This constant fear and stress is further exasperated by Drumbarger's advancing years (fifty), combined with torn ligaments in his left shoulder which cause it to dislocate easily (P 27), making him even more vulnerable.

Brief discussions regarding having to fight to survive have occurred at all of Drumbarger's parole hearings so, while the Board has expressed some sympathy and not held these Disciplinaries against him harshly for parole purposes, they still haven't taken any action to refer him to a facility with other sex-offenders for treatment and advancement to a minimum security setting, which is within their purview and Drumbarger would argue, functional obligation as a body empowered to assess and refer inmates to programs within the T.D.O.C. to both rehabilitate them and make them more worthy parole candidates. This lack of action in Drumbarger's case show's not only deliberate indifference, it also displays the T-BOP's true lack of intention to ever parole him, which is not the law nor the applicable parole scheme for Drumbarger; a clear due process violation.

83. The named individual T-BOP defendants either failed to set-up provisions for Drumbarger to get sex-offender treatment through referral to the

S.O.T.P. -- or to a community based S.O.T.P. as a condition of parole if the T.D.O.C. program won't accept him -- or ignored procedures in place to help Drumbarger get sex-offender treatment.

84. Mental health problems are a serious medical need and are protected under the Constitution, including the Americans with Disabilities Act and § 504 of the Rehabilitation Act. Drumbarger has been eligible for release since January 2004 and is a worthy candidate for treatment based on Dr. McSpadden's recommendation (Exhibit H in Addendum), but has been discriminated against by the defendants with no rational rehabilitative purpose. Defendants only goal has been to not grant parole to sex-offenders off their sex offenses (P 18, 37-38, Exhibit A in Addendum), which is not the laws or policies applicable to Drumbarger's 1981 parole scheme.

Drumbarger has already completed over twenty-nine (29) years of incarceration, is nearly eight (8) years past his Release Eligibility Date, and has been continued past thirty-one (31) years of incarceration before his next parole hearing, all with no provision for sex-offender treatment, despite doctor's referral (Exhibit H in Addendum). How do these actions justify any rational relationship to rehabilitation or further a legitimate governmental purpose?

### Defendant Parole Board Employees

85. Ronnie Cole is a voting member of the T-BOP and, acting under of state law, chaired Drumbarger's 2009 and 2010 parole hearings (which the later generates this § 1983 complaint).

86. B/M cole did not review Drumbarger's parole eligibility using the parole scheme and criteria in effect at the time of his late 1981 to 1982 offenses (P 11-15), as other, similarly situated prisoners have been in years past (see Exhibits J and K in Addendum), which gave him a presumption of

22

parole "[w]hen first eligible"(P 12), a clear 14th Amendment violation of Drumbarger's due process rights.

This is evidenced when, in 2009, B/M Cole continued Drumbarger one year, stating "I am going to request a psychological evaluation be conducted to see if you do meet the applicable statutory language" (that Drumbarger be "not likely to reoffend" [P 33,    and in 2009 hearing transcript]), and then sent him to a specialist contracted by the T-BOP who was not allowed to give Drumbarger the language required by the Board for him to make parole (P 34-40), Exhibit p in Addendum). As a long-time member of the T-BOP, Cole surely would have known their policy of not paroling sex-offenders, & knowingly participated in conducting a fraudulent hearing; another clear due process violation of Drumbarger's 14th Amendment rights.

87. Cole further violated Drumbarger's rights to due process by not making any meaningful mention of the gatekeeping, psychological evaluation in 2010 (P 45), nor advising Drumbarger how he came up short or what he could do to make himself a more worthy candidate, which is mandated within his parole scheme (P 13), and was requested by counsel Lonnie Hoover (P 49).

88. The pre-release psychological evaluation is required by statute for sex-offenders (P 14). Referring Drumbarger to this evaluation is part of his due process and 14th Amendment equal protection rights, as other, similarly situated inmates as Drumbarger have gone through this screening in the past and have made parole off the recommendations of their psychological examiners (see Exhibits J & K in Addendum). Having it done according to law created for Drumbarger a liberty interest and expectation should he garner a favorable review. Given the positive feedback he'd already gotten from Dr. Anne McSpadden, PH.D. (P 20), combined with B/M Cole only deferring him one year in spite of a disciplinary infraction and "[t]he serious-

23

ness of the crimes you have committed" (P 32), Drumbarger could expect that coming back a year later with: a) no new disciplinaries, b) a psychological evaluation wherein he knew he had been found to be in the low-risk category, and, c) the added completion of the T.D.O.C. Pre-Release Class, then he could reasonably expect that those elements (combined with his 1981 parole scheme), would add up to a parole grant (albeit with the possible referral to sex-offender treatment as a condition of parole). To not review Drumbarger with the presumption of parole, nor using the T.C.A. § 40-35-503(c) guidelines for sex-offenders (P 14-15), was a violation of Drumbarger's due process, and equal protection rights, as well as a violation of the Ex Post Facto Clause of the U.S. Constitution.

89. B/M Ronnie Cole committed these violations in the course of continuing Drumbarger three (3) more years for no stated reason, nor for any rational rehabilitative purpose. As Drumbarger's counsel noted, this decision was "devastating" to Drumbarger (P 49, and 2010 hearing transcript).

90. B/M Cole violated Drumbarger's 14th Amendment equal protection rights and showed deliberate indifference to a serious medical need in contrast to the 8th Amendment, the Americans with Disabilities Act, and § 504 of the Rehabilitation Act, when he failed to refer Drumbarger to any programs of treatment, either within the T.D.O.C., or as a condition of parole, as other similarly situated prisoners (both sex-offenders and other special needs inmates warranting rehab), are afforded (Exhibits J & K in Addendum), despite his counsel's request for him to be allowed to do more (P 49).

91. Defendant Robert Irvin is Executive Director of the T-BOP. As such, Irvin is directly responsible for administrative and executive functions of the T-BOP, and he is ultimately accountable for the actions of his subordinates. Irvin sets T-BOP policy -- both written and unwritten. It was his

24

unwritten policy of not paroling sex-offenders off of their sex offenses that has severely prejudiced Drumbarger from being evaluated as a worthy candidate per his 1981 parole scheme, thus violating his 14th Amendment due process and equal protection rights, and in contrast to the Ex Post Facto Clause of the U.S. Constitution (P 72-76), as other similarly situated prisoners as Drumbarger have received timely and fair parole hearing and grants in the past based upon the same applicable parole scheme as Drumbarger (see Exhibits J & K in Addendum). Irvin operates under color of state law.

92. Irvin also showed deliberate indifference to Drumbarger's serious medical need in violation of the 8th Amendment and the Americans with Disabilities Act, as well as § 504 of the Rehabilitation Act, through his capacity as executive director of the T-BOP when he failed to insure and implement a policy that took into account the serious medical needs of Lifers coming before the Board of Paroles who had sex offenses. Irvin either ignored policies and procedures in place ready for implementation, or failed to insure his subordinates followed-through with these procedures, which should have taken into account such things as Dr. Anne McSpadden's psychological evaluation of Drumbarger, the needs of Drumbarger to be a better candidate to live and remain free once paroled, and the best interests of society, who also had a clear stake in Drumbarger not committing new crimes once paroled. The T-BOP could not function to violate Drumbarger's Constitutional rights without Irvin's knowledge and consent (P's 77-84). Irvin was key to the physical & mental injuries to plaintiff described P's 80-82.

93. Defendant William Parsons was and is the Parole Hearing Director for the T-BOP. Operating under color of state law, Parsons was the individual directly responsible for reviewing Drumbarger's claims on direct appeal.

94. Parsons violated Drumbarger's 14th Amendment due process and equal pro-

tection rights when he failed to correct, upon plaintiff's appeal, the Constitutional violations of: a) not assuring the applicable parole scheme for Drumbarger's late 1981 to January 1982 offenses was adhered to (in violation of his 14th Amendment due process and equal protection rights, as well as an Ex Post Facto violation); b) ignoring the expert opinion of Dr. Anne McSpadden, Ph.D., an expert on sex-offenders funded by the state, when she certified in writing in Drumbarger's appeal that he was "[a] low risk for reoffending," which Drumbarger contends (even absent Dr. Phillip Rutledge's positive psych-eval with low risk scores for recidivism), meets the statutory requirement of a prisoner being certified as not likely to reoffend -- the gatekeeper (P 14), and the only element lacking for Drumbarger to make parole according to B/M Ronnie Cole (P 33) and I.P.O. John Elder (P's 36, 40, 51-54, see Exhibit F in Addendum), as well as the facts of the case; c) ignoring Dr. Anne McSpadden's prescription for treatment (either in a minimum security setting, or in a community based program as a condition of parole (see Exhibit H in Addendum).

95.    Parsons' actions have injured Drumbarger both physically by causing him to serve significantly more time (P's 45, 49, 73, 79), and mentally by adding to his anxiety and depression by not being reviewed under the parole scheme applicable to him (P 81), and the daily stress, insecurity and real fear of being attacked on a daily basis because of his charges (P's 26-30, 80, 82, and Exhibit L in Addendum).

96.    Lastly, Parsons has the executive responsibilities to decide whose appeals merit or don't merit reconsideration. Drumbarger explained in his appeal that the T-BOP was requiring verbatim language in their psychological evaluations that their contracted company for these evaluations, MHM, was not allowing its' examiners to give, which was clearly a due process

violation, and he took no action to correct the faulty process, or bring it to the attention of Executive Director Irvin -- indicating that Parsons was complicit in the process.

97.    Whether expressly stated or implied, ALL NAMED DEFENDANTS have been, and continue to be, directly responsible for the Constitutional violations as well as the physical and emotional injuries that Drumbarger has stated herein.  Their one policy, of not paroling sex-offenders off of their sex offenses, has had a cascading and overlapping detrimental effect to plaintiff that continues to harm him on a daily basis.  This unwritten and illegal policy amounts to a civil commitment for Drumbarger (having a Life sentence [P 37-38]), where no civil commitment laws exist in Tennessee.  Justice demands legal intervention for, no matter how repugnant the crimes may be, Constitutional safeguards cannot be ignored.

### VII. RELIEF REQUESTED

WHEREFORE, Plaintiff Drumbarger respectfully prays that this Court grant the following relief:

A.    Declare that the actions and omissions described herein violated Drumbarger's Fourteenth (14th) Amendment rights to Due Process, Equal Protection, and the Ex Post Facto Clause of the United States' Constitution.

B.    Declare that the actions and omissions described herein violated Drumbarger's Eight (8th) Amendment rights, and the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

C.    Find that Defendant Jim Crosby, M.D., violated Drumbarger's Constitutional rights, the Americans with Disabilities Act, and § 504 of the Rehabilitation Act and, as such, Enter an Order for injunctive relief that the Tennessee Department of Corrections Sex-Offender Treatment Program should

27

be made available to all prisoners with sex-offenses, including Lifers with parole, no later than two years prior to their Release Eligibility Dates.

D.    Enter a judgement and injunction appointing a special master to determine if the Tennessee Sex-Offender Treatment Program, as it exits now, is: a) Comprehensive enough to adequately treat all sex-offenders within two years of their Release Eligibility Dates; b) adequately staffed with persons qualified to treat every person within two years of his/her Release Eligibility Date; and c) readily accessible to all prisoners within two years of his/her Release Eligibility Date.

E.    Enter an Order and Finding that: a) Either or both of the psychological evaluations certified in writing by Dr. Stephen Rutledge, Ph.D. and Dr. Anne McSpadden, Ph.D., do meet the requirements of Tenn.Code.Ann. § 40-35-503(c) and sufficiently certify him as not likely to reoffend and remand him for a new parole hearing conducted in accordance with that finding, or; b) Order that a new parole hearing be conducted by an independent panel appointed by this Court -- since defendants have already established their bias against Drumbarger -- utilizing the parole scheme and statutes applicable to the time of Drumbarger's offenses, to include a new psychological evaluation conducted in accordance with T.C.A. § 40-35-503(c).

F.    Grant Drumbarger nominal, compensatory, and punitive damages against defendant Jim Crosby, M.D., and find that because Defendant Crosby is responsible for administrative and executive functions related to his position as Assistant Commissioner for the Tenn. Dept. of Corrections, he is only entitled to Qualified Immunity, unless it is found that he exceeded his jurisdiction.

G.    Find that Defendants Robert Irvin, William Parsons, and Ronnie Cole violated Plaintiff Drumbarger's Constitutional rights by not conducting Dr-

28

umbarger's 2010 parole hearing in compliance with the applicable parole sch-
eme and statutory laws for when his offenses were committed, and were other-
wise at fault for not conforming to the legislative intent of said parole
scheme and applicable statutory laws.

H.  Grant Drumbarger nominal, compensatory, and punitive damages against de-
fendants Ronnie Cole and William Parsons to begin tolling from Drumbarger's
April, 2010, parole hearing; and against defendant Robert Irvin to begin
tolling from Drumbarger's January, 2004, parole hearing (when parole guide-
lines were first ignored). Also find that because defendants Irvin and Par-
sons are responsible for administrative and executive functions related to
their positions on the Board of Parole, they are only entitled to Qualified
Immunity; unless the Court finds that all three of these defendants exceed-
ed their jurisdiction, and would therefore have forfeited any immunity.

I.  Find that defendant Robert Irvin violated Plaintiff Drumbarger's Consti-
tutional rights by knowingly contracting a company to do sex-offender pre-
parole psychological evaluations (MHM) who had ordered their experts not to
certify anyone, no matter how low their risk assessment.

J.  Grant Drumbarger nominal, compensatory, and punitive damages against de-
fendant Irvin to begin tolling from Drumbarger's T-BOP conducted psychologi-
cal evaluation (September, 2009), and also find that since Irvin is respon-
sible for administrative and executive functions related to his position as
executive director of the T-BOP, he is only entitled to Qualified Immunity;
unless the Court finds that he exceeded his jurisdiction, and therefore wo-
uld have forfeited any immunity.

K.  Order defendants, or their agents, to comply with Dr. Anne McSpadden's
prescription and certification, and that he immediately be placed in a sex-
offender treatment program in a minimum security setting. If one is not av-

ailable within the Tennessee Department of Corrections for Drumbarger at this time, then to make the necessary arrangements for him to get sex-offender treatment through a community based program, which provisions are already established for by T.D.O.C. and Board of Parole policy.

**L.** Grant Drumbarger nominal, compensatory, and punitive damages against defendants Crosby and Irvin to begin tolling from Drumbarger's Release Eligibility Date (December, 2003), for not having already established for Drumbarger a procedure -- or failing to insure an existing procedure was adhered to -- for him to receive sex-offender treatment.

**M.** Enter an injunction barring defendants or their agents from taking any present or future punitive action against Drumbarger, or witnesses John Elder and Dr. Anne McSpadden, Ph.D. [Drumbarger can demonstrate with documentation that Dr. Phillip Rutledge, Ph.D., was terminated from his position at MHM after defendant Parole Board employees learned that Dr. Rutledge had been truthful with Drumbarger about why he could not "certify" him verbatim as the T-BOP has required]. Said injunction would bar termination, transfer, demotion, harassment, or any other action deemed to be punitive in design.

**N.** Order any other such additional relief as this Honorable Court may deem just and proper, with the intent to deter defendants from future violations.

Respectfully submitted,

*William L. Drumbarger*

William L. Drumbarger
W.T.S.P. -- 98676
PO Box 1150
480 Green Chapel Rd.
Henning, TN 38041-1150

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, William L. Drumbarger, declare under penalty of perjury that the foregoing complaint is true to the best of my knowledge, information, and belief.

*william L. Drumbarger* 7-10-11
NAME/DATE

William L. Drumbarger
W.T.S.P. -- 98676
PO Box 1150
480 Green Chapel Rd.
Henning, TN 38041-1150

## NOTARY SEAL

Sworn and subscribed before me on this, the 10th day of July, 2011, in the County of Lauderdale, Tennessee. My Commission Expires: Sept. 18 2012

Honorable Notary Public

**A D D E N D U M**

# TABLE OF CONTENTS

Page

EXHIBIT A  .....................................................  34, 35

EXHIBIT B  .....................................................  36

EXHIBIT C  .....................................................  37

EXHIBIT D  .....................................................  38

EXHIBIT E  .....................................................  39

EXHIBIT F  .....................................................  40, 41

EXHIBIT G -- Reserved

EXHIBIT H  .....................................................  42, 43

EXHIBIT I  .....................................................  44, 45, 46

EXHIBIT J  .....................................................  47, 48, 49

EXHIBIT K  .....................................................  50, 51

EXHIBIT L  .....................................................  52

33



**STATE OF TENNESSEE**
**DEPARTMENT OF CORRECTION**
4TH FLOOR RACHEL JACKSON BLDG.
320 SIXTH AVENUE NORTH
NASHVILLE, TENNESSEE 37243-0465

June 16, 1997

Mr. William Michael Lee, #98676
Lake County Regional Correctional Facility
Route One, Box 330
Tiptonville, TN 38079

Dear Mr. Lee:

Assistant Commissioner Bass has referred your May 12 letter regarding the Sex Offender Treatment Program to me for response.

Please forgive me to the delayed response. I recognize that you are dealing with some important issues. I wish I had an easy answer for you.

You suggested in your letter that the Board of Paroles will not parole you if you have not participated in the Sex Offender Treatment Program (SOTP). It is my understanding that the Parole Board is no longer supposed to deny sex offenders because they could not enter into sex offender treatment. However, they may, and I anticipate that they will, decline parole to sex offenders because of the seriousness of their offense.

Based on the content of your letter, it would appear that you are making some positive gains toward correcting the manner in which to think about life in general. There are some things outlined in your letter that raise concern. I recognize that I do not have all the facts concerning your sexual offense, however, I would strongly encourage you to evaluate your emotions and motives as they pertain to your relationship with Ms. Steele and specifically your attraction to her eight-month-old child. Please accept this recommendation as a precautionary concern that I have as a counselor who has worked with many sex offenders.

I am sharing a copy of your letter with Dr. Barbara Bergman, DeBerry Special Needs Facility. Dr. Bergman, the treatment staff and I will look into your case plus a few other sex offenders who are facing similar circumstances such as you.

(CONT.)

Mr. William Michael Lee, #98676
Page Two
June 16, 1997


Thank you for sharing your concerns with Assistant Commissioner Bass.

Sincerely,

Lenny Locoeo
Director of Mental Health Services

LL:ck

pc:     Operational Support Services File, Lee #98676
        Dr. Barbara Bergman, DSNF

END

35

# TENNESSEE DEPARTMENT OF CORRECTION
## SEX OFFENDER
## CRITERIA CHECKLIST

INMATE NAME:_____  INMATE NUMBER:_____

REFERRING FACILITY:_____  DATE OF REFERRAL:_____

INTERVIEWER'S NAME:_____

1. The Client has a felony conviction for a sexual offense.  Yes____ No_____

2. The Client is medically, mentally, intellectually, and behaviorally stable enough to safely benefit from participation in residential sex offender treatment.  Yes____ No_____

3. The Client admits he is a sex offender and requests treatment in the sex offender program.  Yes____ No_____

4. The Client must be willing to waive confidentiality. It is necessary for therapists to obtain information from agencies who have treated or have had contact With the client.  Yes____ No_____

5. The Client has a custody level of medium or minimum Restricted and is at most 9 years from flat date.  Yes____ No_____

6. The Client has a custody level of minimum direct or less and is at most 13 years from flat date.  Yes____ No_____

7. Client has no Class A disciplinaries within the past three years.  Yes____ No_____

8. Client has no Class B Disciplinaries within past two years.  Yes____ No_____

Original Copy:  Forward to DSNF SOTP Unit Director
Photocopy:  Filed in Programmatic Record.

136A                                                  August 1996



EXHIBIT C

# OFFICE OF THE DISTRICT ATTORNEY GENERAL

VICTOR S. JOHNSON III
*District Attorney General*

LETTER OF SUPPORT

*W TSP*
*1-23-04*

Tuesday, January 20, 2004

The Honorable Charles M. Traughber
Chairman, Board of Paroles
404 James Robertson Parkway, Suite # 1300
Nashville, TN 37243-8581

RE: William Lee Drumbarger, TOMIS NO: 00098676

TRANSMITTED BY FAX: 532-8581

Dear Chairman Traughber:

I have been notified that the above-cited inmate is scheduled for a parole hearing on January 23, 2004. This inmate has served over twenty years of his sentence, having been incarcerated for more than twenty-two years. Considering the plea bargain offer to settle his cases, he has now served more than double the amount of time he would have received had the offer been accepted. At trial, after the plea bargain was rejected by his attorney, he received a much higher sentence than he would have received had he been allowed to plead guilty.

The victims in the case long since have reached adulthood. The State has not been able to contact them for purposes of this letter. Therefore, the State has no objection to this inmate being paroled, if the Board chooses to do so.

Sincerely,

*Mary Hausman*

Mary Hausman
Assistant District Attorney

LETTER OF SUPPORT

*1/23/04*
*C.T.*

END

CRIMINAL DIVISION • 20TH JUDICIAL DISTRICT • DAVIDSON COUNTY

Washington Square, Suite 500 • 222 2nd Avenue North • Nashville, TN 37201-1649
Tel. 615 862-5500 • Fax 615 862-5599

Wednesday, July 14, 2010

Wm. Drumbarger

WTSP   --98676

P.O. Box 1150

Henning, TN  38041

Mr. Drumbarger:

Please accept my apologies for the long delay in responding.  It was never my intent to be so callously late.  At the same time, this will be my last communication on this matter.

When I tested you for the Parole Board in September, 2009 at the direction of my employer at that time (MHM) among the instruments I used was an instrument called the Static-99. At that time it was the only norm-referenced test available for sex offenders (that may still be the case).  You scored a three which the norms of the instrument identify as "moderate-low."  That generally means that the person with such a score represents a moderate to low risk for re-offense according to the norms of the Static-99.  More specifically the test norms identify that those people who score a three would be expected to reoffend at the rate of 12% within the first five years after release from incarceration.  After 10 years an additional 2% would be expected to reoffend; and finally, after 15 years post release a total of 19% (an additional 5%) of the group of "three scorers" would be expected to reoffend.

 Whether these values are deemed certifiable as not likely to reoffend is a call I have never been authorized to make.  I gather there was a time before my employment with MHM when psychologists did use a "low, medium, high risk" wording in their psychological evaluations.  I was instructed not to use this wording; and the reason for avoiding this type of rating was, as best as I could discern, because of litigation issues.  So, no, to have said in my evaluation that I "certified" you as not likely to re-offend was not wording that I was permitted to use.

Again, this is all I have to say on the matter.  If the information in this letter can help you and your representative as you pursue due process, then fine.  I wish you well.

Sincerely,

Stephen Rutledge, Ph.D., HSP

Licensed Psychologist  TN Lic # 1685

END

## BY THE NUMBERS

■ 13,235 — Offenders released from Tennessee prisons and jails in fiscal year 2003

■ 15 — Months, on average, it takes for offenders to commit a crime upon release from a TDOC facility

■ 13 — Months, on average, it takes for offenders to be rearrested for illegal activity if released to probation

■ 18 — Months, on average, it takes for offenders to be arrested again if they were released because their sentence ran out

Source: Tennessee Department of Correction

# Criminals more likely to reoffend

Online: Hear criminologist Dr. Shela Van Ness talk about reoffenders. Comment.

By Jacqueline Koch
Staff Writer

George Eiland fell into a pattern in the 1970s.

His son was seriously ill. He felt pressure to make ends meet. And he had little money.

So he began robbing banks.

After serving time in federal prison from 1977 to 1981, he vowed to change his life. It wasn't that simple. He continued robbing banks, serving two more stints in prison from 1986 to 1994 and 1996 to 2008.

"I just got caught up in the world and money and all that," said Mr. Eiland, 61, who now lives in Chattanooga. "I got out and had intentions of doing good but fell back into some old patterns — drinking and gambling and stuff — that really kind of led to my demise the first time."

He's not unusual. More than 40 percent of convicted felons released from Tennessee prisons and jails returned within three years, according to the most recent statistics compiled by the state Department of Correction.

More than 20 percent returned to incarceration after

See OFFENDERS, Page B4

## BACK TO PRISON
EXHIBIT E

| Year | Number released | Number returned | Percent failure rate |
| --- | --- | --- | --- |
| 2002 | 12,977 | 2,696 within one year | 21 |
| 2001 | 12,446 | 4,325 within two years | 35 |
| 2000 | 13,415 | 5,634 within three years | 42 |

Source: Tennessee Department of Corrections

# Offenders

Continued from Metro

just one year, data for fiscal year 2003 show.

Those figures are down from a 2001 report, which showed that 50 percent of felons returned after three years and 23 percent returned after one.

Recidivism, defined loosely by most agencies as the rate criminals who have been incarcerated return to prison after release, varies by type of release. Offenders released on probation or parole were more likely to return to prison than those released because their sentence expired, the report shows.

"This may be related to the demographics of the population rather than the characteristics of the releasing institution, as local jail releases tend to be younger and are more likely to have been convicted of property or drug offenses," the report states.

### SUPPORT SYSTEMS NEEDED

Young people tend to reoffend more often because they have less at stake, said Tim Dempsey, chief executive officer of Chattanooga Endeavors, a local nonprofit organization that helps released prisoners adjust to society and find jobs. Adults — who have more to lose in terms of children, a job and a house — generally try to stop their criminal habits, he said.

The best deterrent for recidivism is a support system for those leaving prisons, Mr. Dempsey said.

"They can't just deliver some intervention and drop somebody," he said. "They need to make sure the person is sort of following through and not in need of other services," including job and housing searches and mental health counseling, among others, he said.

When the economy slumps and unemployment in general is high, however, the number of reoffenders rises, Mr. Dempsey said.

"This group of former felons suffers an unemployment rate that is much higher than the general population, and when they're unemployed, they tend to reoffend," he said.

Mr. Eiland said he doesn't think he'll return to prison. He's found his moral compass and

support from his family. Focusing his energy on helping other people makes him less likely to reoffend, he said.

"It gives me a better chance of staying out when I quit being selfish," said Mr. Eiland, who drives a van for Chattanooga Endeavors.

Calculating the number of reoffenders throughout the state is difficult because agencies have different ways of measuring them. The Tennessee Department of Correction defines recidivism as a permanent return to incarceration in any of its facilities or a local jail after release from either.

The Tennessee Board of Probation and Parole calculates recidivism by looking at the number of offenders sentenced back to prisons or local jails relative to the total census, according to its annual report.

Specific recidivism rates for the Hamilton County Jail were not available.

### WHO REOFFENDS

Those most likely to reoffend are not violent criminals, said Shela Van Ness, Ph.D., a criminologist and associate professor of sociology at the University of Tennessee at Chattanooga.

Reoffenders tend to make their criminal habits a way of life, she said. People who can't afford to rent a place or purchase food will steal whenever they need money, she said.

Committing petty crimes "usually doesn't take a whole lot of skill, and usually people have done these crimes many, many, many times before they get caught and prosecuted," she said. "So you have some habits, especially when people are not making a lot of money on their jobs, they run into tremendous temptations to write a bad check or steal someone else's identity."

People who commit violent crimes usually do so as a onetime act of desperation, Dr. Van Ness said. Many don't anticipate pulling a gun or knife and killing someone but do so out of surprise or anger.

"They're caught in a really oddball situation that's not usual to their situations," she said. "A lot of violent crimes are basically accidents."

The cost of incarceration for one inmate for one year is $25,000 to $30,000, Dr. Van Ness said.

E-mail Jacqueline Koch at jkoch@timesfreepress.com

> " When (felons are) unemployed, they tend to reoffend. "
> — Tim Dempsey, Chattanooga Endeavors

Case 3:11-cv-00684   Document 1   Filed 07/15/11   Page 39 of 55 PageID #: 39



# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE INQUIRY - INFORMATION REQUEST

W. T. S. P.
_____
INSTITUTION

William Drumbarger                    98676
_____                   _____
INMATE NAME *(Please Print)*          INMATE NUMBER

UNIT: **4B**    ROOM / BED: **39**    DATE: **may 05, 2010**

ROUTED TO: ☐ Unit Manager  ☐ Inmate Relations Coordinator (IRC)  ☐ Counselor  ☐ Job Coordinator

1. Inmate Inquiry/Request:

I have a question: On the 23rd of April
You told me that without the "certified" as
"not likely to reoffend" language by the psych-
evaluator, that the parole Board's "Hands were
tied." when next I go up For parole, can
You Find out if it's permissable For my-
self or my attorney to hire our own psychol-
ogical expert?

THANK YOU !!

Wm. Drumbarger                    5-5-10
_____               _____
COUNSELOR/IRC SIGNATURE           DATE

IPPO

3. Action by Record Office:

My understanding is that all out side Eval.
is accepted. As the above Sounds like IF I
Have a Psych. Exam Expert I would get a
Positive Result(s) Don't that sound Fishie to you Too

_____               5-10-10
RECORD'S OFFICE STAFF SIGNATURE   DATE

4. Sentence Management Service (SMS) Response:

_____
_____
_____
_____

_____    *(Cont.)*    _____
SMS STAFF SIGNATURE                 DATE

CR-3118 (Rev. 1-07)    White - Inmate    Canary - Record Office    Pink - Counselor IRC    RDA 1167

Typed Transcript of EXHIBIT F

Plaintiff/DRUMBARGER:

I have a question: On the 23rd of April you told me that, without the "certified" as "not likely to reoffend" language by the psych-evaluator, that the Parole Board's "Hands were tied." When next I go up for parole, can you find out if it's permissable for myself or my attorney to hire our <u>own</u> psychological expert?

                                    THANK YOU!!

Wm. Drumbarger                       5-5-10


Response/IPPO Elder:

My understanding is that no outside eval. is accepted. As the above sounds like If I Hire a Psych. Exam Expert I would get a Positive Result(s) Don't that sound fishie to you too

J. Elder IPO                         5-10-10


**END**



TO:       Tennessee Board of Parole and Probation

FROM:    Dr. Anne McSpadden, Psychologist
           Mental Health Coordinator WTSP

DATE:    June 8, 2010

RE:       William Drumbarger #00098676

Mr. Drumbarger is an inmate at W.T.S.P. who is well known to me. He has been incarcerated at this institution as well as others where I have been employed. When serving in the capacity of contract psychologist at Northwest, Mr. Drumbarger participated in an anger management group with me. He is well educated and willing to engage in self examination. However, due to his sentencing structure, he has not been eligible to participate in sex offender treatment within the TDOC system.

As a psychologist who has evaluated and worked with sex offenders for many years, the skills which we teach sex offenders are important and necessary to reduce the risk that they will engage in future offending behavior. The goal of treatment is no more victims. Mr. Drumbarger has been willing to participate in any treatment made available to him. As he has a sentence structure which would not allow him to ever be considered for the program within the TDOC system, I would recommend the Board of Parole consider allowing him to participate in a community based program either in conjunction with his placement in a minimum security setting or as a contingency of release on parole.

As you know the legislature mandated that an offender be certified "as posing no risk to the safety of the public" prior to being released on parole. This is based on the psychologist or psychiatrist's assessment of the individual's risk level indicting that to a "psychological certainty" the offender does not pose risk of reoffending. The phrase psychological certainty is legal terminology and is not consistent with the way psychologists assess risk and predict likelihood of future behavior. This man who was sentenced to a lengthy period of time based on the circumstances of his case prior to passage of the legislation that requires certification.

**(CONT.)**

Risk predications with sex offenders are typically based on demographic information which is static and can be measured over time. This man is a low risk for reoffending based on the instruments commonly used to measure sex offender risk. This information rather than a sentencing structure should be utilized to determine suitability for treatment. As most psychologists are not willing to certify that individuals who have committed sex offenses such as those of this inmate are without risk of reoffending if released, this essentially shuts the door for Mr. Drumbarger to further reduce his risk level. I would suggest the board of parole consider the circumstances in this case and make some provision to allow this man to complete sex offender treatment.


Anne McSpadden, Ph. D.
Psychologist-Health
Services Provider


Cc:file
inmate

EXHIBIT I



**STATE OF TENNESSEE**
**DEPARTMENT OF CORRECTION**
**LOIS M. DeBERRY SPECIAL NEEDS FACILITY**
**7575 COCKRILL BEND BLVD.**
**NASHVILLE, TENNESSEE 37209-1057**
**TELEPHONE (615) 350-2700 ✎ FAX (615) 350-2901**

May 9, 2007

Mr. William Drumbarger, #98676
West Tennessee State Penitentiary – Site #2 (WTSP)
PO Box 1150
Henning, TN 38041-1150

Dear Mr. Drumbarger,

At your request, your name has been placed on Sex Offender Treatment Program
(SOTP) secondary waiting list. Your participation in our program will depend on some
admission criteria such as number of inmates on primary waiting list, your sentence
expiration date, infractions, psychological evaluation, and admission of responsibility.

The individuals from primary waiting list with the shortest expiration dates who would
have enough time to successfully complete the program have priority.

Mr. Drumbarger – I appreciate your motivation; however, with the primary waiting list
being so long, it is hard to predict when applicants from secondary waiting list will be
selected to attend SOTP. Therefore, I encourage you to take advantage of any mental
health, educational, and vocational program available at your facility.

Sincerely,

Satya Hota, MS
SOTP Program Director

(CONT.)

Case 3:11-cv-00684   Document 1   Filed 07/15/11   Page 44 of 55 PageID #: 44

EXHIBIT I



eTomis

**Menu    Favorites    Tools    Other Applications    Reports**

**E-mail**

Suspend

Reset key fields

Create a Message    List Messages    View Message    Maintain Nicknames    Mai

| Staff ID | **WASHAL01** | **Washington, Alvin** | | | Site |
| Subject | **Drumbarger-98676** | | Date | **04/06/2011** | Time |
| Forwarded By | | | | | |

Inmate William Drumbarger- 98676 Wrote A Personal
Letter Requesting Sotp Treatment. Could You Let
Him Know That He Will Be Placed On The Sotp
Waiting List. Thanks.

Enter

Save

First

Send

Delete

Pagedown

FastPath
           Go

(CONT.)

## Denys.A Yeager - William Drumbarger-98676

| | | |
|---|---|---|
| **From:** | Alvin.D Washington | |
| **To:** | Henry, Robert.L | **EXHIBIT I** |
| **Date:** | 6/22/2011 7:49 AM | |
| **Subject:** | William Drumbarger-98676 | |
| **CC:** | Yeager, Denys.A | |

We (CBCX/SOTP) received a letter from inmate William Lee Drumbarger-98676 (6/22/2011). Could you let him know that once he meets the parole board around 4/2013 according to him in his letter and if the decision looks favorable we will look at the opportunity for treatment at that time. The key word is look because a lot of things has to go with any decision we make regarding treatment. The important thing for now is that you are on the SOTP waiting list. Thanks for giving this information to the inmate. Have a good day.

**END**

file://C:\Documents and Settings\b141902\Local Settings\Temp\XPgrpwise\4E019E85sd08Bf4fS02f00f3...  6/23/2011

Case 3:11-cv-00684  Document 1  Filed 07/15/11  Page 46 of 55 PageID #: 46

**EXHIBIT J**

```
TOMIS ID:  00079281   PROCTOR, RANDALL W.
   Status:  ACTV    Sex:  M    Race:  W    Age:  51    Location:  P22F

   Active Detainer: N   Escape History: N   Sex Offnr: Y      Out to Court: N
Commissioner Alert: N    Incompatible: Y    Actv ISC: N   Unprocessed Sent: N
Mult./Child Rapist: N          Repeat Violent Offnr: N  Tech Violator Pgm: N
 Minimum Sentence:      Yrs     Mos     Days     Life: X
 Maximum Sentence:      Yrs     Mos     Days     Life without Parole:
  Death:         Date of Execution:              Habitual:
  SED:  11/11/1975        SV:                  Probation Exp:
  RED:                    MP:                        CC Exp:
   PP:  10/05/1999        EXP:                     PERB CED:
   RP:                    FXP:                     PERB RED:
Parole Eligibility Docket:              Parole Hearing Sched:
Last Parole Hearing Type:  IP  INITIAL PAROLE
Last Parole Hearing:  04/18/2000          Future Action Date:
Last Prle Decision:  EF  REC EFFECTV REL DATE     Alt Rlse Date:  10/16/2000
 NEXT FUNCTION:       DATA:
 F1-HELP      F5-PREVIOUS  F6-NEXT      F9-QUIT      F10-REFRESH  F11-SUSPEND
```

�направ *Served 25 Years*

**(CONT.)**

47

```
TOMIS ID:  00079281  PROCTOR, RANDALL W.        EXHIBIT J
   Status:  ACTV     Sex:  M    Race:  W     Age:  51    Location:  P22F

      County of     Case   Case                                          Snt
  S Conviction      Year   Number      Cnt     Offense Description       Sta
  - --------------  ----   -----------  ---  -----------------------------  ---
    011 CHEATHAM     1976 8324-9998    000 1104 RAPE                       AC
    011 CHEATHAM     1976 8325-9997    000 1303 ASSAULT W/INTENT TO MURDER IN
```

( Forceful Homosexual Assault )

```
Search:
NEXT FUNCTION:        DATA:
F1-HELP     F9-QUIT      F11-SUSPEND

BOTTOM OF LIST
```

**(CONT.)**

Case 3:11-cv-00684   Document 1   Filed 07/15/11   Page 48 of 55 PageID #: 48

**EXHIBIT J**

TOMIS ID:  00079281   PROCTOR, RANDALL W.
Status:  ACTV   Sex:  M   Race:  W   Age:   51   DOB:  06/08/1959

| S | Move Date/Time | A/D | From/To | | Move Reason | |
|---|---|---|---|---|---|---|
| | 10/16/2000 01:31 PM | D | MTCX | P22F | REGPA | REGULAR (PAROLE) |
| | 06/19/2000 10:45 AM | D | WTSP | MTCX | CLASN | CLASSIFICATION ASSIGNMENT |
| | 01/14/2000 08:45 AM | D | NWCX | WTSP | CLASN | CLASSIFICATION ASSIGNMENT |
| | 01/23/1998 08:00 AM | D | LCRC | NWCX | POPMG | POPULATION MANAGEMENT |
| | 05/21/1992 08:40 AM | D | MTRC | LCRC | CLASN | CLASSIFICATION ASSIGNMENT |
| | 05/15/1992 05:17 PM | A | 019 | MTRC | RETNO | RETURN - NO CHARGES |
| | 05/15/1992 08:53 AM | D | MTRC | 019 | OUTNO | OUT TO COURT - NO CHARGES |
| | 05/13/1992 04:47 AM | D | LCRC | MTRC | COURT | COURT ORDERED |
| | 02/09/1990 02:00 AM | D | TCIP | LCRC | CONIN | CNDCT INCNTVE / RELEASNG TO DE |
| | 02/09/1990 01:00 AM | A | 011 | TCIP | RETNO | RETURN - NO CHARGES |

Search:
NEXT FUNCTION:       DATA:
F1-HELP       F8-PAGEDOWN  F9-QUIT       F11-SUSPEND

TOP OF LIST

**END**

Case 3:11-cv-00684  Document 1  Filed 07/15/11  Page 49 of 55 PageID #: 49

TOMIS ID:  00101088   MILLER, DWIGHT          **EXHIBIT K**
  Status:  INAC     Sex:  M     Race:  W     Age:  49     Location:

  Active Detainer: N   Escape History: N   Sex Offnr: H      Out to Court:
Commissioner Alert: N    Incompatible: N    Actv ISC: N   Unprocessed Sent: N
Mult./Child Rapist:        Repeat Violent Offnr:    Tech Violator Pgm: N
Minimum Sentence:       Yrs     Mos       Days    Life:
Maximum Sentence:    20 Yrs     Mos       Days     Life without Parole:
  Death:        Date of Execution:              Habitual:
  SED:                    SV:                 Probation Exp:
  RED:   09/14/1987       MP:                       CC Exp:
  PP:                     EXP:  03/03/2000        PERB CED:
  RP:                     FXP:  02/16/2003        PERB RED:
Parole Eligibility Docket:            Parole Hearing Sched:
Last Parole Hearing Type:  AD  ADMINISTRATIVE
Last Parole Hearing:  11/14/1990          Future Action Date:
Last Prle Decision:  OA  REC PROGRAM APPROVED     Alt Rlse Date:
NEXT FUNCTION:        DATA:
F1-HELP      F5-PREVIOUS  F6-NEXT      F9-QUIT      F10-REFRESH  F11-SUSPEND


      *   Sentence Effective Date: 2/16/83

      *   Paroled 11/14/1990


(CONT.)


50

**EXHIBIT K**

TOMIS ID:  00101088  MILLER, DWIGHT
    Status:   INAC      Sex:  M     Race:  W     Age:  49     Location:

| S | County of Conviction | Case Year | Case Number | Cnt | Offense Description | Snt Sta |
|---|---|---|---|---|---|---|
| 063 | MONTGOMERY | 1983 | 20252 | 000 | 1111 AGGRAVATED SEXUAL BATTERY | IN |

Search:
NEXT FUNCTION:          DATA:
F1-HELP      F9-QUIT      F11-SUSPEND

BOTTOM OF LIST

**NOTE:**  Dwight Miller was my cellmate, and told me himself
that he had performed fellatio on a minor boy, 5 yrs. of age.

W. L. D.

**END**

```
TOMIS ID:  00098676  DRUMBARGER, WILLIAM L.
   Status:  ACTV    Sex:  M    Race:  W    Age:  48    Location:  WTSP
```

|  S | Incident Date | Incident ID | Disc Class | First Infraction Type |
| --- | --- | --- | --- | --- |
| Latest -- | 07/03/2008 | 00750543 | C | FIG   FIGHTING |
|  | 04/07/2005 | 00611540 | B | FIG   FIGHTING |
|  | 08/21/2003 | 00542356 | C | AIE   ATTEMPT TO INTIMIDATE EMP |
|  | 02/09/2001 | 00442331 | C | FIG   FIGHTING |
|  | 10/25/2000 | 00431857 | C | OOP   OUT OF PLACE |
|  | 06/14/1999 | 00372345 | B | LAR   LARCENY |
|  | 02/25/1999 | 00358848 | B | FIG   FIGHTING |
|  | 04/29/1996 | 00242566 | C | VPR   VIOL. OF TDOC/INST. POLIC |
|  | 01/05/1994 | 00144881 | C | FIG   FIGHTING |
|  | 03/09/1993 | 00113666 | C | DIS   CREATING A DISTURBANCE |
|  | 12/10/1992 | 00104027 | C | FIG   FIGHTING |
|  | 06/30/1992 | 00087236 | C | FIG   FIGHTING |
|  | 06/06/1991 | 00073563 | C | OOP   OUT OF PLACE |
|  | 05/08/1991 | 00073564 | C | RDO   REFUSED DIRECT ORDER |
|  | 05/08/1991 | 00073565 | C | FIG   FIGHTING |
|  | 02/06/1991 | 00073566 | C | FIG   FIGHTING |
|  | 11/10/1990 | 00073567 | C | FIG   FIGHTING |
|  | 03/27/1990 | 00073568 | C | FIG   FIGHTING |
|  | 02/13/1990 | 00073569 | C | FIG   FIGHTING |
|  | 09/26/1989 | 00073570 | C | FIG   FIGHTING |
|  | 07/23/1989 | 00073571 | C | FIG   FIGHTING |
|  | 08/26/1986 | 00073572 | C | DSR   DISRESPECT |
|  | 08/26/1986 | 00073573 | C | RDO   REFUSED DIRECT ORDER |
|  | 08/31/1985 | 00073574 | C | FIG   FIGHTING |
|  | 04/28/1985 | 00073575 | C | FIG   FIGHTING |
| First | 07/25/1983 | 00073576 | A | ASL   ASSAULT |
|  | 07/25/1983 | 00073577 | A | RDO   REFUSED DIRECT ORDER |

⁎ **NOTE:** Oftentimes an officer will serve two write-ups for one incident...
For example, a "Refused Direct Order" or "Creating a Disturbance with a
"Fighting" write-up.

**END**

Case 3:11-cv-00684   Document 1   Filed 07/15/11   Page 52 of 55 PageID #: 52

July 13, 2011

RECEIVED
IN CLERK'S OFFICE

JUL 15 2011

U.S. DISTRICT COURT
MID. DIST. TENN.

William Drumbarger
WTSP -- 98676
PO Box 1150
480 Greens Chapel Rd.
Henning, TN 38041-1150

Office of the Clerk
United States District Court
801 Broadway, Suite 800
Nashville, TN 37203

    Dear Clerk of the Court:

Enclosed you will find the original and one (1) copy of my Civil Rights, § 1983
complaint ready for filing. Also enclosed, you will find my Application to
Proceed in Forma Pauperis, as well as three (3) copies each of the Summons for
the four (4) named defendants in this action. Would you please send me the date
when they are served? (THANK you).

Attached to this letter you will find an extra copy of the cover sheet for my
complaint that I respectfully request that you would STAMP it as "Filed" and mark
with the appropriate Civil Action Number, before returning.

Lastly, I respectfully request that you would advise me of any Orders, Findings,
or Judgements in this matter.

Respectfully submitted,


_William R. Drumbarger_
William L. Drumbarger


p.c.: file



William Drumbarger
WTSP — 98676
PO Box 1150
480 Greens Chapel Rd.
Henning, TN 38041-1150

RECEIVED
IN CLERK'S OFFICE

JUL 15 2011

U.S. DISTRICT COURT
MID. DIST. TENN.

OUTGOING
JUL 13 2011
WTSP
MAILROOM

*Legal MAIL*

Office of the Clerk
United States District Court
801 Broadway, Suite 800
Nashville, TN 37203

HASLER
017H15637708
$8.900
07/13/2011
Mailed From 38041
US POSTAGE

PRIORITY MAIL
UNITED STATES POSTAL SERVICE
LABEL 107 JUNE 2002
www.usps.com



THE DEPARTMENT OF CORRECTION WTSP
HAS NEITHER INSPECTED NOR CENSORED AND
IS NOT RESPONSIBLE FOR THE CONTENTS